UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| DARYL SCHEETZ, | CIV. 13-4144-KES |
| Plaintiff, | |
| vs. | |
| DENNIS KAEMINGK, Secretary of Corrections, in his individual and official capacity; ROBERT DOOLEY, Chief Warden and Director of Prison Operations, in his individual and official capacity; DARREN YOUNG, Warden, in his individual and official capacity; TROY PONTO, Associate Warden, in his individual and official capacity; ARTHUR ALLCOCK, Associate Warden, in his individual and official capacity; CLIFFORD FANTROY, Director of Security, in his individual and official capacity; CRYSTAL VAN VOOREN, Major Special Security, in her individual and official capacity; and HUNTER SUMMERS, Lieutenant Special Security, in his individual and official capacity, | ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT |
| Defendants. | |

Plaintiff, Daryl Scheetz, filed this lawsuit under to 42 U.S.C. § 1983 arguing that defendants violated his constitutional rights. Docket 1. Scheetz later amended his complaint. Docket 66. Defendants moved for summary judgment and asked the court to stay discovery. Docket 73; Docket 74. The

court granted the motion to stay discovery pending resolution of defendants'
renewed motion concerning qualified immunity. Docket 77. For the following
reasons, defendants' motion for summary judgment is granted in part and
denied in part.

## FACTUAL BACKGROUND[1]

In 2007, Scheetz pleaded guilty to aggravated assault and was sentenced
to serve 15 years imprisonment. Docket 75-3 ¶ 3. On January 26, 2012,
Scheetz signed a Suspended Sentence Supervision Agreement. Docket 75-8. In
this agreement, Scheetz agreed to follow the rules of the Department of
Corrections (DOC). *Id.* He also acknowledged he had been advised that violating
the supervision agreement could result in his suspended sentence being
imposed. *Id.*

In July 2012, while Scheetz was incarcerated at Mike Durfee State Prison
(MDSP), he was investigated for smuggling tobacco into the prison. Docket
41-2. While searching Scheetz's cell, prison officials discovered a can of
chewing tobacco, which is considered contraband at the prison. Docket 41-3.
The next day, prison officials found eighteen more cans of chewing tobacco in
Scheetz's closet. Docket 41-4. On July 27, 2012, Scheetz was found guilty of
smuggling after a disciplinary hearing. He was sentenced to ninety days in
disciplinary segregation and fined $100. Docket 41-9. There was no change to
his visiting privileges. Docket 51-11 ¶ 4.

---

[1] Because defendants move for summary judgment, the court
recites the facts in the light most favorable to Scheetz. Where the facts
are disputed, both parties' averments are included.

In August of 2012, Scheetz was transferred to the South Dakota State Penitentiary (SDSP). Docket 75-2 ¶ 5. After the transfer, on August 27, 2012, the South Dakota Board of Pardons and Paroles issued a violation report because Scheetz's smuggling infraction violated the conditions of his parole. Docket 75-7 at 2. After Scheetz's attorney asked for several continuances, a hearing before the parole department was scheduled for April 2013. Docket 75-4 ¶¶ 11-13.

On April 8, 2013, the parole board dismissed the alleged violation. Docket 51-1. In his amended complaint, Scheetz alleges that defendants were aware of the parole board's decision because it is accessible through the DOC COMS system to which the defendants had access. Docket 66 at 3. He also claims it was common knowledge at both SDSP and MDSP. *Id.* Ponto and Summers dispute this, averring that they did not access the information and did not even know if it was accessible. Docket 75-1 ¶ 23; Docket 75-5 ¶ 10.

On April 17, 2013, Scheetz's visitors were put on Class II visits, meaning the visits took place behind glass through a phone, there was no contact allowed, and only one visitor was allowed at a time. Docket 51-2; Docket 66 at 3. This was nine days after the board dismissed the parole violation allegation. Docket 51-11 ¶ 11. Between his release from the Segregated Housing Unit after he arrived at SDSP and April 2013, Scheetz had Class I visiting status. *Id.* ¶¶ 6, 10. Under DOC policy, "Inmates may be allowed visits with approved visitors except where there is suspicion that such visitation would jeopardize

the security, safety, or the disciplined operation of an institution." Docket 41-14 at 1.

Defendants aver that in April 2013, SDSP staff gathered information that led them to believe that Scheetz was involved with a scheme to smuggle contraband with another inmate, Nathaniel Hayes. Docket 75-1 ¶ 6. Scheetz alleges that Hunter Summers told him the information came from a confidential informant. Docket 66 at 3. Defendants aver that the belief that Scheetz was involved stemmed from two recorded phone calls between Hayes and his girlfriend.

According to defendants, in a recorded phone call on or about April 12, 2013, Hayes asked his girlfriend if she was "coming up," and she responded, "We'll roll them and get ready to come up." Docket 75-1 ¶ 7. Hayes said, "I told my Homie that if your guys were coming up I wasn't going to undo it so I'll make sure he knows that real quick." *Id.* ¶ 8. In the second phone call, on or about April 15, Hayes's girlfriend said, "We're going to come up tonight . . . I didn't get anything in the mail[, so] I'll take some money out of my school fund." *Id.* ¶ 9. Special security believed Hayes and his girlfriend were discussing smuggling contraband and that Hayes's "homie" was Scheetz. *Id.* ¶ 10. When special security interviewed Hayes's girlfriend, she told them Hayes was "having someone send her money[,]" but she did not know who. *Id.* ¶ 13.

Scheetz avers that he did not know Hayes and was not associated with him in any way before he was accused of smuggling with Hayes. Docket 51-11 ¶¶ 13-15. In an affidavit, Hayes avers that he had never met Scheetz before he

was accused by prison security of smuggling contraband with him. Docket 51-10 ¶¶ 1, 5. Hayes also avers that he never mentioned Scheetz on a phone call from prison and never sold contraband to Scheetz. *Id.* ¶ 4. Finally, Hayes avers that he never received money from Scheetz for contraband or anything else and neither had anyone he knows. *Id.* ¶ 3.

Scheetz filed an Informal Resolution Request on April 24, 2013, asking about his visitation status. Docket 75-11. In the request he claimed that there was "no reason for this punishment" even though prison policy requires a prison staff give him a reason in this situation. *Id.* After saying that there "was no reason for this change to my visits," Scheetz requested the restoration of his Class I visitation status. *Id.*

Troy Ponto arranged a meeting with Summers to explain to Scheetz why his visits had been restricted. Docket 75-5 ¶ 4. During the meeting, Ponto attempted to discuss the smuggling investigation. *Id.* ¶ 5. Scheetz alleges that Summers and Ponto asked him to inform on other inmates during this meeting. Docket 66 at 4. When he refused, they told him "we'll get back to you[.]" *Id.* Ponto and Summers aver that, when they explained that they would not restore Scheetz's visitation status, he became upset and refused to say anything during the meeting. Docket 75-5 ¶¶ 6-7; Docket 75-1 ¶20.

After this meeting, in June 2013, Scheetz sent a letter to Warden Robert Dooley explaining the situation. Docket 66 at 4. During Dooley's walk through of SDSP, Scheetz approached Dooley and asked Dooley about his visit restriction. *Id.* at 5. Dooley told Scheetz that he received his letter but that he

would not change Scheetz's visit status. *Id.* Dooley avers that, during this meeting, Scheetz did not mention that he believed defendants were retaliating against him for the dismissal of his parole violation. Docket 75-2 ¶ 7.

In his amended complaint, Scheetz alleges that he had a chance meeting with Clifford Fantroy and asked him to look into his visit status. Docket 66 at 4. Later, Scheetz spoke to Fantroy again, and Fantroy told him that his name was not on any type of investigation at the prison and that Fantroy could not understand what was going on. *Id.*; *see also* Docket 75-14 at 2 (Scheetz claiming in a Request for Administrative Remedy that "senior staff" told him that his name had "not come up in any investigation up here").

Scheetz alleges that he spoke to Young about his situation, and Young told Assistant Warden Arthur Allcock to look into it. Docket 66 at 5. Allcock, however, told Scheetz in passing that Scheetz "must have done something wrong" and did not contact him further. *Id.*

On September 5, 2013, Scheetz approached Dooley, Crystal Van Vooren, and Darin Young during their walk through of SDSP. Docket 75-12. Scheetz told them that he was on Class II visits and that he thought it was in retaliation for the infraction at MDSP and the dismissal of his parole violation. *Id.* He asked defendants to restore his visit status. *Id.*

On October 2, 2013, Scheetz was notified that his children were being taken off his visitors list for not "meeting requirements." Docket 51-3. Scheetz asked a prison official why his children were taken off his list, and he alleges he was told it was because their social security numbers had been lost by

prison officials. Docket 66 at 6. After Scheetz provided the information, his children were returned to his visit list. *Id.*

On October 7, 2013, in a meeting with Scheetz, Van Vooren showed him an email from Dooley that stated he would not get his visitation status back, a decision he based on "reports" about Scheetz. Docket 75-14 at 2. Scheetz claimed in a Request for Administrative Remedy that these "reports" were made by Van Vooren and "based on lies and false accusations." *Id.*

Between September and November 2013, Scheetz grieved his visitation issue through the prison administrative process. Docket 66 at 5-6. In a Request for Administrative Remedy dated October 8, 2013, Scheetz requested restoration of normal visiting privileges. Docket 75-14 at 2. In this request, Scheetz states, "It is obvious by now that this action against my family and I is a purely retaliatory decision led by Ms. Van Vooren." *Id.* He also states that the email Van Vooren showed him

> proves my contention, it is retaliation rather than an investigation, because had a real investigation truly been done surely I would have been cleared of any wrongdoing. Add to that the fact that senior staff has told me that my name has not come up in any investigation up here and it is very plain to see what is really going on.

*Id.*

On October 21, 2013, Scheetz complained that his mother and daughter were not on his visit list. Special security responded saying that his daughter's visitation had been restored. Docket 51-5. On December 20, 2013, Scheetz was told that Special Security would not return his mother to his visit list. Docket 51-7. On January 7, 2013, however, the prison told Scheetz that his mother

- 7 -

was never actually removed from his visit list; she was merely on Class II visits. Docket 51-9. Prison official Steve Baker avers that the confusion was caused by the fact that Scheetz's mother uses two different names. Docket 75-6 ¶ 11.

On December 24, 2013, Scheetz filed a Request for Administrative Remedy, asking about his visitation status. Docket 75-16. He complained that he had "been on Class II visits since April 17, 2013[,] on one of Ms. Van Vooren's whims." *Id.* at 2. He asked what reason Van Vooren had to keep his mother off of his visit list "unless it's just a personal vindictive grudge." *Id.* He sought a reason why he was on Class II visitation status. *Id.* at 3. He stated, "[I]n the last 15 months I've done nothing to warrant this[,]" and that his normal visits were taken away for no reason. *Id.* Finally, he stated, "Look, I get it you people are mad at me for my actions in Springfield." *Id.* On March 5, 2014, after Scheetz filed the current suit, he was returned to Class I visiting status. Docket 75-6 ¶ 12.

On December 26, 2013, Scheetz filed a pro se civil rights lawsuit under 42 U.S.C. § 1983, alleging violations of his constitutional rights. Docket 1. Defendants answered, arguing that Sheetz's visitation restriction was not due to his exercise of a constitutionally protected right. Docket 32.

Defendants moved for summary judgment and argued that Scheetz's claims were baseless and that he was punished because he smuggled contraband into the prison. *Id.* In Scheetz's response to this motion, he spelled out clearly and for the first time that he was alleging that his punishment was

in retaliation for exercising his First Amendment rights, specifically, defending himself in a parole hearing. Docket 49.

Defendants' motion for summary judgment was referred to a magistrate judge on April 23, 2015. Docket 53. The magistrate judge issued a report and recommendation that dismissed all claims except for Scheetz's Eighth Amendment claim based on retaliatory punishment. Docket 58. In response, Scheetz requested leave to amend his complaint. Docket 62. The court granted this motion, and on August 19, 2015, Scheetz filed an amended complaint. Docket 66.

The court requested that each party submit a proposed schedule addressing deadlines on various matters related to the litigation. Docket 68. In their proposed schedule, defendants requested that discovery be stayed pending resolution of the question of whether they are entitled to qualified immunity. Docket 73 at 2. On October 1, 2015, defendants filed a renewed motion for summary judgment, raising, among others, the argument that they are entitled to qualified immunity. Docket 74. The court stayed discovery until resolution of the qualified immunity issue. Docket 77.

## STANDARD OF REVIEW

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or by showing that the nonmoving party has not presented evidence to support an

element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To avoid summary judgment, "[t]he nonmoving party may not rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (citation omitted and quotation marks).

Prisoners who proceed pro se are entitled to the benefit of liberal construction at the pleading stage. *Quam v. Minnehaha Cty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987). Nonetheless, the summary judgment standard set forth in Rule 56 of the Federal Rules of Civil Procedure remains applicable to prisoners proceeding pro se. *Id.* The district court is not required to "plumb the record in order to find a genuine issue of material fact." *Barge v. Anheuser–Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996). Courts must remain sensitive, however, "to the special problems faced by prisoners attempting to proceed pro se in vindicating their constitutional rights, and [the Eighth Circuit does] not approve summary dismissal of such pro se claims without regard for these special problems." *Nickens v. White*, 622 F.2d 967, 971 (8th Cir. 1980). "When dealing with summary judgment procedures the technical rigor is inappropriate where . . . uninformed prisoners are involved." *Ross v. Franzen*, 777 F.2d 1216, 1219 (7th Cir. 1985).

## DISCUSSION

Defendants contend that they are entitled to qualified immunity. Section 1983 provides a cause of action against any "person who, under the color of

any statute, ordinance, regulation, custom, or usage, of any state" causes the deprivation of a right protected by federal law or the United States Constitution. 42 U.S.C. § 1983. The doctrine of qualified immunity, however, generally shields " 'government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Smith v. City of Minneapolis*, 754 F.3d 541, 545 (8th Cir. 2014) (alteration in original) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To overcome a qualified immunity defense at the summary judgment stage, a plaintiff must show: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009). The court may analyze these two factors in either order. *Hutson v. Walker*, 688 F.3d 477, 483 (8th Cir. 2012) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). But "[t]o deny the officers qualified immunity, [the court] must resolve both questions in [the plaintiff's] favor." *Hawkins v. Gage Cty.*, 759 F.3d 951, 956 (8th Cir. 2014).

## I.    Supervising Officers

"[V]icarious liability is inapplicable to § 1983 suits[.]" *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010). "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* (quoting

*Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). "[A] supervising officer can be liable for an inferior officer's constitutional violation only 'if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation.' " *Id.* (quoting *Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997).

Secretary of Corrections Kaemingk is alleged to have refused to hear Scheetz's administrative appeal on his visitation issue.  Defendants point out that changes in visitation privileges are not among the subjects that can be appealed to the Secretary of Corrections. Kaemingk's refusal to hear Scheetz's appeal, which was non appealable, cannot be the basis for his individual liability.

Scheetz alleges that Dooley, Young, Ponto, Fantroy, and Allcock refused to intervene in the administrative process to restore his visitation status. But, none of these defendants were themselves responsible for restricting Scheetz's visitation.  By the time Scheetz made them aware of the situation, the decision to restrict his visitation had already been made. Also, it is unclear whether and to what degree these defendants had the ability to stop the alleged constitutional violation.

Because Scheetz has failed to demonstrate that these defendants Kaemingk, Dooley, Young, Ponto, Fantroy, and Allcock deprived him of a constitutional right, he cannot overcome their qualified immunity defense. *See Howard*, 570 F.3d at 988. Summary judgment in favor of Kaemingk, Dooley, Young, Ponto, Fantroy, and Allcock is granted.

## II.     Retaliation

Next, the court will consider Scheetz's claims against Van Vooren and Summers. To establish a retaliation claim, Scheetz must show "(1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer v. Jackson Cty.*, 738 F.3d 907, 911 (8th Cir. 2013) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). In order to succeed on a retaliation claim, a plaintiff must show that the "adverse action taken against him was 'motivated at least in part' by his protected activity . . . ." *Id.* (quoting *Revels*, 382 F.3d at 876). Although "[t]he causal connection is generally a jury question, ... it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1025 (8th Cir. 2012) (quoting *Revels*, 382 F.3d at 876).

### A.     Deprivation of a Constitutional Right

To overcome a qualified immunity defense at the summary judgment stage, a plaintiff must show: "the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right . . . ." *Howard*, 570 F.3d at 988. As an initial matter, this is not a case of retaliatory discipline. If it were, Scheetz would have to prove that "but for a retaliatory motive the prison official would not have filed the disciplinary report." *Haynes v. Stephenson*, 588 F.3d 1152, 1156 (8th Cir. 2009) (citing *Goff*

*v. Burton*, 7 F.3d 734, 737 (8th Cir. 1993)). Here, however, no disciplinary report was filed and no disciplinary hearing was conducted. Docket 66 at 7. Due process protections are necessary before imposing prison discipline.

In *Hartsfield v. Nichols*, 511 F.3d 826 (8th Cir. 2008), the Eighth Circuit Court of Appeals discussed the importance of these due process protections before applying the "but for" standard of retaliatory discipline claims. On appeal, Hartsfield, the inmate, argued that prison officials' "uncorroborated allegations as set forth in their disciplinary reports" were not "legally sufficient evidence . . . to satisfy the 'some evidence' standard because '[a] contrary holding would essentially preclude any inmate from ever bringing a retaliation claim.' " *Id.* at 829.

The court held that "such a holding would [not] automatically 'preclude any inmate from ever bringing a retaliation claim' " because of the due process protections that the Supreme Court outlined in *Wolff v. McDonnell*, 418 U.S. 539 (1974). *Hartsfield*, 511 F.3d at 830. Because of these protections, "the hearing could produce a favorable result for the inmate[,]" and "the inmate would not be precluded from maintaining suit." *Id.*

Here, there was no hearing. Scheetz was not protected by the procedures outlined in *Wolff*. To hold him to the "some evidence" standard would be improper because he did not receive the constitutional protections provided in a prison hearing. Scheetz was not formally punished; he was merely denied visiting privileges. Defendants aver that Scheetz was limited to Class II visits under SDDOC policy 1.5.D.1. Docket 75-1 ¶ 14. This policy makes clear that

visitation "is a privilege." Docket 41-14 at 1. Therefore, Scheetz's claims are more similar to those raised in *Spencer*. *See Spencer*, 738 F.3d at 911-12.

Spencer claimed his removal from a trustee program was retaliatory. Viewing the facts in the light most favorable to Spencer, the court concluded that there was a genuine dispute of material fact as to whether Spencer's removal from the trustee program was motivated by a previous lawsuit Spencer filed against the defendant prison official, Carter. *Id.* at 912. Spencer had been approved to enter the program three separate times. *Id.* at 911-12. Then, he was removed from the program "almost immediately" after he reminded Carter he had filed a lawsuit against her. *Id.* at 911. He had only received one charge, and it had not previously kept him from being readmitted. *Id.* at 912.

The court found Carter could not explain why Spencer was denied with essentially the same record as he had when he was previously admitted. *Id.* Carter claimed her decision to remove Spencer was due to his extensive violent history and past behavior in the facility. *Id.* The court found that she had not shown why that behavior did not disqualify him from the program in the past. *Id.* The court found a genuine dispute of material fact and denied summary judgment. *Id.*

Here, there is also a genuine dispute of material fact. The first two prongs of the retaliation test are uncontested: Scheetz exercised his constitutional right by defending himself in front of the parole board, and the revocation of visiting privileges constitutes an adverse action that would chill a person of ordinary firmness from continuing to exercise the constitutional

right. The issue is whether the change in visiting privileges was in part motivated by the parole board's dismissal of Scheetz's parole violation.

Scheetz's parole violation was dismissed on April 8, 2013. Docket 75-10. Nine days later, his visit status was changed to Class II. *Id.* ¶ 11. Timing in this regard is extremely important:  where the disciplinary action takes place "almost immediately" after a defendant learns of the protected constitutional activity, there is a sufficient nexus in time to show causation. *Santiago v. Blair*, 707 F.3d 984, 993 (8th Cir. 2013); *Haynes*, 588 F.3d at 1156-57.

Defendants argue that timing is not enough. They argue that timing alone does not rule out "the possibility of a mere coincidence." Docket 75 at 23 (quoting *Schoonover v. Schneider Nat'l Carriers, Inc.*, 492 F. Supp. 2d 1103, 1147 (S.D. Iowa 2007)). The record, however, contains facts concerning more than timing alone.

Scheetz sets forth specific facts that call into question whether suspicion of smuggling was the reason his visits were restricted. For one, he was not formally punished: no disciplinary report or hearing followed his visitation restriction. Docket 66 at 7. Also, when Scheetz was actually found guilty at MDSP, his visits were not restricted. Docket 51-11 ¶ 4. According to defendants, this "suspicion" resulted in a visitation restriction but an actual finding of guilty on an infraction did not. Also, the infraction defendants suspected Scheetz of was not related to visitation. He was suspected of sending money to Hayes' girlfriend in the mail. That has nothing to do with Scheetz's visits.

As pointed out by Magistrate Judge Duffy, and admitted by defendants, the investigation was not completed when Scheetz was put on Class II visits. Scheetz's visits were restricted on April 17, 2013. Docket 51-11 ¶ 9. Hayes and his girlfriend spoke on April 12 and 15, but SDSP officials did not interview Hayes' girlfriend until April 18. Docket 75-1 ¶¶ 7-9, 11. Also, when Hayes' girlfriend was interviewed, she did not implicate Scheetz. *Id.* ¶ 13.

Defendants also allege that Scheetz's visits were restricted because the contents of his institutional file made them suspicious that he was smuggling contraband. *Id.* ¶¶ 14-16. This kind of information, however, is the type of information that the Eighth Circuit held was not enough to justify adverse action in *Spencer*. 738 F.3d at 912. Further, Scheetz states that he enjoyed Class I visits from the time he arrived at SDSP until April 17, 2013, even though his institutional file was equally suspicious as it was when his visits were later restricted. Docket 51-11 ¶ 10.

Scheetz has set forth specific facts to challenge defendants' non-retaliatory reason for his visit restriction. He claims that he never met nor had anything to do with Hayes before he was accused of smuggling. *Id.* ¶¶ 13-15. In his affidavit, Hayes avers the same of Scheetz. Docket 51-10 ¶¶ 1, 3-5.

Scheetz also points to numerous other issues with his visiting status after he was put on Class II visits. Prison officials removed his children from his visit list because prison officials allegedly lost their social security numbers. Docket 51-11 ¶ 12. Prison officials told Scheetz his mother was taken off his

visit list even though she was not and refused to put her back on his visit list. *Id.* These issues were cleared up eventually, but the prison officials' explanation, that the children's social security numbers were lost and his mother's name was confused, had never come up before the alleged retaliation began.

Defendants argue throughout their brief that Scheetz did not allege that he believed his visit restriction was retaliatory before he filed his complaint. Even if this were necessary to demonstrate a deprivation of a constitutional right, Scheetz puts forward facts showing that he *did* complain to defendants that he was being retaliated against. In his October 8, 2013 Request for Administrative Remedy, he claims that defendants actions were "purely retaliatory" and constituted "retaliation rather than an investigation[.]" Docket 75-14 at 2. Even when Scheetz does not use the word retaliation, as the defendants point out throughout their briefs and affidavits, he continually says there is "no reason" for his visits to be restricted. While defendants interpret this to mean that he believed he was not being retaliated against, a reasonable interpretation is that there was not a *legitimate* reason for the restriction, showing that he believed defendants were retaliating against him.

Defendants argue that the knowledge issue is dispositive here. They cite cases applying the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), to Title VII discrimination claims. Even if the same analysis applied here, it would not mean that defendants are entitled to summary judgment based on qualified immunity.

Defendants cite *Schoonover v. Schneider National Carriers, Inc.*, 492 F. Supp. 2d 1103 (S.D. Iowa 2007). In *Schoonover*, the court makes clear that the "facts surrounding the protected activity and adverse employment action" as well as the timing issue are "key." *Id.* at 1157. The court states that knowledge "of the protected activity is one such fact, for if the decisionmaker was unaware of the protected activity, no reasonable factfinder could decide the plaintiff's discharge occurred, as the statute requires, 'because' of engagement in the protected activity." *Id.* But the Eighth Circuit has stated, "Although '[t]he causal connection is generally a jury question, ... it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury.' " *Beaulieu v. Ludeman*, 690 F.3d 1017, 1025 (8th Cir. 2012) (quoting *Revels*, 382 F.3d at 876).

At this stage, before discovery has begun, the court finds, viewing the facts and inferences from those facts in the light most favorable to Scheetz, that he has set forth sufficient facts to demonstrate a constitutional deprivation.

### B.    Right Clearly Established

The second prong of the qualified immunity analysis asks whether "the right was clearly established at the time of the deprivation." *Howard*, 570 F.3d at 988. Here, the law had been clearly established prior to defendants' actions in April 2013.  In *Revels*, 382 F.3d 870, an inmate showing that a prison official took adverse action against him because he engaged in protected

speech (filing grievances in *Revels*), could establish a retaliation claim under 42 U.S.C. § 1983.

The court finds that Scheetz has shown that the facts, viewed in the light most favorable to him, demonstrate he was deprived of a constitutional right, and that right was clearly established at the time of the deprivation. At this time, summary judgment is inappropriate as to Van Vooren and Summers, and they are not entitled to summary judgment based on qualified immunity as to Scheetz's retaliation claim. Therefore, their motion is denied.

### III.   Equal Protection

Scheetz also asserts an equal protection claim pursuant to the Fourteenth Amendment.  Scheetz alleges he is the only inmate to have lost visitation privileges under these circumstances.  Thus, he alleges a "class of one" Equal Protection claim, which was recognized by the Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam).

The Eighth Circuit applied the class of one analysis to a prison inmate who alleged that he was being discriminated because the parole board denied him parole while granting parole to similarly situated inmates.  *Nolan v. Thompson*, 521 F.3d 983, 989 (8th Cir. 2008). Because Nolan did not allege he was a member of a protected class or that his fundamental rights had been violated, he had to show that "the Board systematically and 'intentionally treated [him] differently from others similarly situated and that there is no rational basis for the difference in treatment.' " *Id.* (quoting *Olech*, 528 U.S. at 564). To do this, Nolan had to " 'provide a specific and detailed account of the

nature of the preferred treatment of the favored class,' especially [because] the state actors exercise broad discretion to balance a number of legitimate considerations." *Id.* at 990 (quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1214-15 (10th Cir. 2004)).

The court held that Nolan failed to provide the evidence necessary to meet his burden because he did not demonstrate that the board "intentionally discriminated against him or even denied him parole on an irrational basis." *Id.* The board had consistently given legitimate reasons for denying parole. *Id.* The record also lacked "sufficient evidence about Nolan's own parole file to enable a meaningful comparison between him and those he claims are similarly situated." *Id.* Even though Nolan provided "a spreadsheet listing the names of approximately twenty other inmates, together with their races, the names of their offenses, sentence length, time served, parole hearing dates, and release dates[,]" the court found that this was insufficient for the court to meaningfully compare Nolan with other inmates. *Id.*

Under the analysis in *Nolan*, Scheetz's Equal Protection fails. Although Scheetz sets forth facts suggesting pretext on defendants' part, he has not provided a spreadsheet as Nolan did, much less "a specific and detailed account of the nature of the preferred treatment of the favored class," which the court held was necessary to support an Equal Protection claim. *Id.* Scheetz only sets forth conclusory allegations about the favorable treatment of other inmates.

He also alleges that "[t]ransfer of funds between inmates is not a 'change of visiting status' offense" and "recently [a] change in visiting status has only been received for misconduct in the visiting room or a failed urinalysis test." Docket 66 at 7. He does not provide any evidence of either statement. Also, based on the record, Scheetz's allegations are incorrect. The policy in the record clearly states, "Inmate may be *allowed* visits . . . except where there is *suspicion* that such visitation would jeopardize the security, safety, or the disciplined operation of an institution." Docket 41-14 at 1 (emphasis added).

Accordingly, Scheetz fails to demonstrate the deprivation of a constitutional right. Because Scheetz has failed to satisfy the first prong of the qualified immunity analysis, summary judgment is granted to all defendants on this claim. *See Hawkins*, 759 F.3d at 956 ("[t]o deny the officers qualified immunity, [the court] must resolve both questions in [the plaintiff's] favor").

## IV.   **Due Process**

Scheetz alleges that his rights under the Due Process clause were violated because he was not given a disciplinary report or hearing. Docket 66 at 7. As the court explained in its initial screening of Scheetz's complaint, the Eighth Circuit has consistently held that there is no constitutional right to visitation in prison. *Ware v. Morrison*, 276 F.3d 385 (8th Cir. 2002). Scheetz's right to contact visits therefore does not constitute a liberty interest protected by the Due Process Clause. *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) (citation omitted) ("A prisoner does not have a liberty interest in contact visitation."); *see also Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460–61

(1989) ("The denial of prison access to a particular visitor 'is well within the terms of confinement ordinarily contemplated by a prison sentence,' and therefore is not independently protected by the Due Process Clause") (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)). The court dismissed Scheetz's due process claim. Docket 15 at 6.

Scheetz again alleged a due process violation in his amended complaint. Docket 66. This claim has not yet been screened under 28 U.S.C. § 1915(e)(2)(B), but Scheetz's amended complaint does not rectify the deficiencies pointed out in this court's order dismissing his original due process claim. Therefore, Scheetz fails to demonstrate the deprivation of a constitutional right, and summary judgment is granted to all defendants on this claim.

## IV.     **Defendant Doe**

Scheetz does not raise a claim against John Doe in his amended complaint. *See* Docket 66. Therefore, Doe is dismissed from the case.

## V.     **Summary Judgment Other Than Qualified Immunity**

Defendants requested and were granted a stay of discovery in order to resolve the issue of qualified immunity. Docket 73; Docket 76. Their motion argues for summary judgment in general. Discovery was stayed, however, specifically to allow defendants to present their qualified immunity defense. To the extent that defendants move for summary judgment on grounds other than qualified immunity, the court denies the motion for summary judgment without prejudice at this time. *See* Fed. R. Civ. P. 56(d) ("If a nonmovant shows

by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion).

## CONCLUSION

Scheetz sets forth facts sufficient to overcome the qualified immunity defense of Van Vooren and Summers as it relates to his equal protection claim. He fails to set forth facts demonstrating that Kaemingk, Dooley, Young, Ponto, Fantroy, and Allcock personally violated his constitutional rights. Therefore, the motion for summary judgment based on qualified immunity is granted as to these defendants. Scheetz fails to demonstrate that his rights under the Equal Protection and Due Process clauses were violated. Therefore, all defendants are granted summary judgment based on qualified immunity as to these claims.

Accordingly, it is ORDERED

1.    Defendants' motion for summary judgment based on qualified immunity (Docket 74) is granted as to Kaemingk, Dooley, Young, Ponto, Fantroy, and Allcock. Summary judgment is entered in favor of these defendants.

2.    Defendants' motion for summary judgment based on qualified immunity (Docket 74) is granted for all defendants as to the Equal Protection and Due Process claims. Summary judgment is entered in favor of all defendants on these claims.

3.     Defendants' motion for summary judgment based on qualified immunity (Docket 74) is denied as to Scheetz's retaliation claim against Van Vooren and Summers.

4.     Scheetz's retaliation claim against Van Vooren and Summers survives summary judgment.

5.     All discovery in this matter will be completed on or before **November 14, 2016**.

6.     All other motions, except motions in limine concerning questions of evidence, will be filed on or before **December 14, 2016**.

7.     The clerk's office is ordered to terminate defendant John Doe from the case.

Dated August 12, 2016.

BY THE COURT:

*/s/Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE