UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| DARYL SCHEETZ,<br><br>             Plaintiff,<br><br>  vs.<br><br>CRYSTAL VAN VOOREN, Major Special Security, in her individual and official capacity; and HUNTER SUMMERS, Lieutenant Special Security, in his individual and official capacity,<br><br>             Defendants. | CIV. 13-4144-KES<br><br><br>ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

Plaintiff, Daryl Scheetz, filed this lawsuit under 42 U.S.C. § 1983 arguing that defendants violated his constitutional rights (Docket 1) and later amended his complaint. Docket 66. Defendants Crystal Van Vooren and Hunter Summers filed a second motion for summary judgment. Docket 109. Scheetz opposes the motion. Docket 117.

**FACTUAL BACKGROUND[1]**

Viewing the evidence in the light most favorable to Scheetz, as the non-moving party, the facts are:

---

[1] The facts are more thoroughly set out in this court's previous orders granting the motion to amend and denying in part the motions for summary judgment. *See* Docket 65; Docket 87. Because defendants move for summary judgment, the court recites the facts in the light most favorable to Scheetz. Where the facts are disputed, both parties' averments are included.

In 2007, Scheetz pleaded guilty to aggravated assault and was sentenced to serve 15 years imprisonment. Docket 75-3 ¶ 3. On January 26, 2012, Scheetz signed a Suspended Sentence Supervision Agreement. Docket 75-8. In this agreement, Scheetz agreed to follow the rules of the Department of Corrections (DOC). *Id.* He also acknowledged he had been advised that violating the supervision agreement could result in his suspended sentence being imposed. *Id.* In July 2012, while Scheetz was incarcerated at Mike Durfee State Prison (MDSP), he was investigated for smuggling tobacco into the prison. Docket 41-2. The investigation involved a correctional officer employed at MDSP. Docket 115-1 at 3. In July or August of 2012 Scheetz was transferred to the South Dakota State Penitentiary (SDSP). Docket 41-10; Docket 75-2 ¶ 5.

Prison officials place a higher priority on investigations involving staff. Docket 115-1 at 3. As a result, prison officials attempted to get Scheetz to cooperate in the investigation involving the correctional officer. *See* Docket 115-1; Docket 115-6. Warden Weber directed MDSP official Leland Tjeerdsma to visit Scheetz in the Segregated Housing Unit (SHU) and try to induce Scheetz to provide information about the investigation. Docket 115-6 at 3. Tjeerdsma interviewed Scheetz at SDSP and testified that he laid out Scheetz's options—that Scheetz could provide Tjeerdsma with information on the investigation or he could remain silent. *Id.* Tjeerdsma made it clear to Scheetz that, if Scheetz remained silent, he would "never see Springfield (MDSP) again." *Id.* Several months later, Tjeerdsma described Scheetz's behavior during the investigation to Van Vooren in an email stating "Inmate

2

Scheetz was very uncooperative in [the] investigation, at one point Warden Weber directed me to tell Inmate Scheetz that if he continued to be uncooperative Warden Weber would be scheduling him for an Ad Seg hearing. (Inmate Scheetz never did cooperate.)." Docket 115-10 at 4.

On July 12, 2012, Leland Tjeerdsma emailed Van Vooren asking whether Scheetz had been cooperative in prior investigations because "I currently have inmate Scheetz in the SHU under investigation for having an officer bring tobacco in for him." Docket 115-10 at 4. Van Vooren then forwarded the email to Summers and Summers responded to Tjeerdsma. *Id.* On July 27, 2012, prison officials determined that Scheetz had committed Major Prohibited Act 5-17, and he was sentenced to ninety days in disciplinary segregation. Docket 41-9. On August 7, 2012, Scheetz received notice of an Administrative Segregation Hearing for possible placement in Administrative Segregation (Ag Seg) to be held on August 14, 2012, as a result of his involvement with smuggling tobacco with a member of the prison staff. Docket 41-11. On August 14, 2012, the board found that Scheetz had committed three minor and one major prohibited act in the last year. Docket 41-12. Thus, he was assigned to the "Ad Seg/Population" for ninety days. *Id.*

On August 27, 2012, the South Dakota Board of Pardons and Paroles issued a violation report because Scheetz's smuggling infraction violated the conditions of his parole. Docket 75-7 at 2. The parole department scheduled a hearing for April. Docket 75-4 ¶¶ 11-13. On April 8, 2013, the parole board dismissed the alleged violation. Docket 51-1. In his amended complaint,

Scheetz alleges that defendants were aware of the parole board's decision because it is accessible through the DOC Comprehensive Offender Management System (COMS) to which the defendants had access and that "at the very least it was common knowledge through the prison grapevine." Docket 66 ¶¶ 15, 17. Scheetz also alleges that his lack of cooperation with the investigation at SDSP "angered" the defendants. *Id.* ¶ 14. Troy Ponto testified during his deposition that the contraband investigation at MDSP in July 2012 was a "big" issue that would have likely filtered down the ranks. Docket 110-4 at 3. Tjeerdsma testified that employees could learn information about parole board activities by simply asking onsite prison staff who were involved with the parole board process. Docket 115-6 at 5. Also, on April 16, 2013, Mike Vonsik, a corrections analyst for the Board of Pardons and Paroles, circulated an email to prison officials[2] detailing the results of the parole board's decision. Docket 75-4 at 2; Docket 115-11 at 6.

On April 17, 2013, Scheetz's visitors were put on Class II visits, meaning the visits took place behind glass through a phone, there was no contact allowed, and only one visitor was allowed at a time. Docket 51-2; Docket 66 at 3. This was nine days after the board dismissed the parole violation allegation. Docket 51-11 ¶ 11. Between his release from the SHU after he arrived at SDSP and April 2013, Scheetz had Class I visiting status. *Id.* ¶¶ 6, 10. Under DOC policy, "Inmates may be allowed visits with approved visitors except where

---

[2] The email does not indicate which officials received the email. Docket 114 at 29.

there is suspicion that such visitation would jeopardize the security, safety, or the disciplined operation of an institution." Docket 41-14 at 1.

Defendants contend that in April 2013, SDSP staff gathered information that led them to believe that Scheetz was involved with a scheme to smuggle contraband with another inmate, Nathaniel Hayes, and that the staff put Scheetz's visitors on Class II status because of his association with Hayes. Docket 75-1 ¶ 6; Docket 87 at 4. Scheetz maintains that he did not know Hayes and was not associated with him in any way before he was accused of smuggling with Hayes. Docket 51-11 ¶¶ 13-15. In an affidavit, Hayes states that he had never met Scheetz before he was accused by prison security of smuggling contraband with him, that he never received money from Scheetz for contraband, and that he never mentioned Scheetz on a phone call from prison. Docket 51-10 ¶¶ 1-5.

Hunter Summers previously submitted a sworn statement to the court where he stated that Hayes was a "known associate" of Scheetz. Docket 75-1 at 3. At his deposition, Summers acknowledged that his previous statement about Hayes and Scheetz's association was not based on his personal knowledge. *Id.* at 7. And Summers could not identify a reason why Scheetz came under suspicion for smuggling contraband with Hayes. *Id.* at 7. Summers also stated that, as of April 2013, Scheetz was not suspected of smuggling contraband and was instead suspected of supplying money to a third party, but Summers acknowledged that he could not identify any evidence of that conduct. *Id.* at 8. Summers has also previously stated in his affidavit that "Special Security staff

5

at the SDSP were not, in any way, involved with the investigation which had been conducted at the MDSP." Docket 75-1 ¶ 24. But subsequent discovery indicates that Special Security Staff knew of, and were involved in, the April 2012 investigation at MDSP. *See* Docket 41-16 ¶¶ 13-14; Docket 115-10 at 4-5.

On April 17, 2013, Crystal Van Vooren sent a letter to Scheetz informing Scheetz that his visitation status was changed to Class II. Docket 51-2. Van Vooren testified at her deposition that she did not provide Scheetz with an explanation as to why his visitation status changed. Docket 115-2 at 5. And Van Vooren acknowledged that she could not recall why Scheetz's visitation status was changed. *Id.* at 7.

Scheetz filed an Informal Resolution Request on April 24, 2013, asking about his visitation status. Docket 75-11. In the request he claimed that there was "no reason for this punishment" even though prison policy requires prison staff to give him a reason in this situation, and he requested Class I visitation status. *Id.* In June 2013, Scheetz sent a letter to Warden Robert Dooley explaining the situation. Docket 66 at 4. During Dooley's walk through of SDSP, Scheetz approached Dooley and asked Dooley about his visit restriction. *Id.* at 5. Dooley told Scheetz that he received his letter but that he would not change Scheetz's visit status. *Id.* Dooley avers that, during this meeting, Scheetz did not mention that he believed defendants were retaliating against him for the dismissal of his parole violation. Docket 75-2 ¶ 7.

6

In his amended complaint, Scheetz alleges that he had a chance meeting with Director of Security Clifford Fantroy and asked him to look into his visit status. Docket 66 at 4. Later, Scheetz spoke to Fantroy again, and Fantroy told him that his name was not on any type of investigation at the prison and that Fantroy could not understand what was going on. *Id.*; *see also* Docket 75-14 at 2 (Scheetz claiming in a Request for Administrative Remedy that "senior staff" told him that his name had "not come up in any investigation up here").

On October 2, 2013, Scheetz was notified that his children were being taken off his visitors list for not "meeting requirements." Docket 51-3. Scheetz asked a prison official why his children were taken off his list, and he alleges he was told it was because their social security numbers had been lost by prison officials. Docket 66 at 6. After Scheetz provided the information, his children were returned to his visit list. *Id.* On October 7, 2013, in a meeting with Scheetz, Van Vooren showed him an email from Dooley that stated he would not get his visitation status back, a decision he based on "reports" about Scheetz. Docket 75-14 at 2. Scheetz claimed in a Request for Administrative Remedy that these "reports" were made by Van Vooren and "based on lies and false accusations." *Id.*

Jennifer Dreiske was Van Vooren's supervisor in April 2013. Dreiske testified at her deposition that she did not know how Scheetz's name came up during the April 2013 investigation into Hayes. Docket 115-8 at 3. On October 1, 2013, Warden Young emailed Dreiske inquiring as to why Scheetz was on Class II visitation status. Docket 115-15 at 2. Dreiske replied that

7

"Special Security states he was busted for drugs coming into the visit room. We approved for him to have Class 2 visits but he is not happy with that." *Id.* Dreiske testified at her deposition that her email to Warden Young was based on incorrect information supplied by Van Vooren regarding the basis for changing Scheetz's visitation status. Docket 115-8 at 7. Thus, Dreiske further testified that she unknowingly relayed incorrect information to Warden Young about why Scheetz was on Class II visitation status. *Id.* Dreiske admitted that as of May 5, 2013, Scheetz had been cleared of any involvement with Hayes. Docket 115-8 at 6. Dreiske could not identify a reason why Scheetz's visitation status was not restored to Class I after May 2013. *Id.*

Between September and November 2013, Scheetz grieved his visitation issue through the prison administrative process. Docket 66 at 5-6. On December 24, 2013, Scheetz filed a Request for Administrative Remedy, asking about his visitation status. Docket 75-16. He complained that he had "been on Class II visits since April 17, 2013[,] on one of Ms. Van Vooren's whims." *Id.* at 2. On March 5, 2014, after Scheetz filed the current suit, he was returned to Class I visiting status. Docket 75-6 ¶ 12. On December 26, 2013, Scheetz filed a pro se civil rights lawsuit under 42 U.S.C. § 1983, alleging violations of his constitutional rights. Docket 1. Defendants answered, arguing that Sheetz's visitation restriction was not due to his exercise of a constitutionally protected right. Docket 32.

Defendants moved for summary judgment and argued that Scheetz's claims were baseless and that he was punished because he smuggled

8

contraband into the prison. *Id.* In Scheetz's response to this motion, he spelled out clearly and for the first time that he was alleging that his punishment was in retaliation for exercising his First Amendment rights, specifically, defending himself in a parole hearing. Docket 49.

Defendants' motion for summary judgment was referred to a magistrate judge on April 23, 2015. Docket 53. The magistrate judge issued a report and recommendation that dismissed all claims except for Scheetz's Eighth Amendment claim based on retaliatory punishment. Docket 58. In response, Scheetz requested leave to amend his complaint. Docket 62. The court granted this motion, and on August 19, 2015, Scheetz filed an amended complaint. Docket 66.

Defendants moved for summary judgment on October 1, 2015. Docket 74. On August 12, 2016, this court granted in part and denied in part defendants' motion for summary judgment. Docket 87. This court's order denied summary judgment as to Scheetz's retaliation claim against Van Vooren and Summers. *Id.* Van Vooren and Summers now make a second motion for summary judgment.

## LEGAL STANDARD

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex*

9

*Corp.*, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." (internal quotations omitted)). The moving party must inform the court of the basis for its motion and also identify the portion of the record that shows there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted).

Once the moving party meets its initial burden, the nonmoving party must establish "that a fact . . . is genuinely disputed" either by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c). "The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). For purposes of summary judgment, the facts and inferences drawn from those facts are "viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).[3]

---

[3] According to local civil procedure rules, a movant's "statement of material facts will be deemed to be admitted unless controverted by the opposing party's response to the moving party's statement of material facts." D.S.D. Civ. L.R. 56.1(d).

## DISCUSSION

To establish a retaliation claim, Scheetz must show "(1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer v. Jackson Cty.*, 738 F.3d 907, 911 (8th Cir. 2013) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). In order to succeed on a retaliation claim, a plaintiff must show that the "adverse action taken against him was 'motivated at least in part' by his protected activity . . . ." *Id.* (quoting *Revels*, 382 F.3d at 876). Although "[t]he causal connection is generally a jury question, . . . it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1025 (8th Cir. 2012) (quoting *Revels*, 382 F.3d at 876).

> This court previously ruled that:
>
> The first two prongs of the retaliation test are uncontested: Scheetz exercised his constitutional right by defending himself in front of the parole board, and the revocation of visiting privileges constitutes an adverse action that would chill a person of ordinary firmness from continuing to exercise the constitutional right. The issue is whether the change in visiting privileges was in part motivated by the parole board's dismissal of Scheetz's parole violation.

Docket 87 at 15-16. This court went on to determine that there were several issues of material fact such as the timing of the parole board decision and when Scheetz's visitation status was changed, the defendants' inconsistent

reasoning for Scheetz's changed visitation status, and Hayes' denial that he knew Scheetz. *Id.* at 16-17. Defendants' argue in their second motion for summary judgment that after a lengthy discovery, "Scheetz has still not been able to make any showing that at the time in question, April 17, 2013, [defendants] had any knowledge whatsoever of the parole board's decision . . . ." Docket 110 at 6. The court disagrees.

Here, the defendants have previously sworn to the fact that they did not have any knowledge of the 2012 contraband investigation involving Scheetz at MDSP prior to April 17, 2013 (*see* Docket 75-1 ¶¶ 24-25) and deny having knowledge of the parole board's decision until after Scheetz's visitation status was changed. Docket 110 at 9. But on July 12, 2012, Leland Tjeerdsma emailed Van Vooren asking whether Scheetz had been cooperative in prior investigations because "I currently have inmate Scheetz in the SHU under investigation for having an officer bring tobacco in for him." Docket 115-10 at 4. Van Vooren then forwarded the email to Summers and Summers responded to Tjeerdsma. *Id.* This email directly contradicts Summers' prior sworn testimony and casts doubt on Summers' truthfulness—a question of fact for the jury to determine.

Further, Troy Ponto testified during his deposition that the contraband investigation at MDSP in July 2012 was a "big" issue that would have likely filtered down the ranks. Docket 110-4 at 3. Tjeerdsma testified that employees could learn information about parole board activities by simply asking onsite prison staff involved with the parole board process. Docket 115-6 at 5. And on

April 16, 2013, Mike Vonsik circulated an email to prison officials[4] detailing the results of the parole board's decision. Docket 115-11 at 6. Again, this evidence creates a question of fact as to whether the defendants learned about the parole board's decision before changing Scheetz's visitation status.

Also, Dreiske testified at her deposition that she did not know how Scheetz's name came up during the April 2013 investigation. Docket 115-8 at 3. On October 1, 2013, Warden Young emailed Dreiske inquiring as to why Scheetz was on Class II visitation status. Docket 115-15 at 2. Dreiske replied that "Special Security states he was busted for drugs coming into the visit room. We approved for him to have Class 2 visits but he is not happy with that." *Id.* Dreiske testified at her deposition that her email to Warden Young was based on incorrect information supplied by Van Vooren regarding the basis for changing Scheetz's visitation status. Docket 115-8 at 7. The fact that Van Vooren gave her supervisor incorrect information as to why Scheetz's visitation status was changed, presents a question of fact as to Van Vooren's motivation for putting Scheetz on Class II visits and as to Van Vooren's truthfulness.

After further discovery and viewing the facts in the light most favorable to Scheetz, the court finds that Scheetz has shown sufficient facts to demonstrate a constitutional deprivation. The court also reaffirms its prior ruling that "Scheetz has shown that the facts, viewed in the light most favorable to him, demonstrate he was deprived of a constitutional right, and that right was

---

[4] The email does not indicate which officials received the email. Efforts to retrieve the email in its entirety are ongoing. Docket 114 at 29.

clearly established at the time of the deprivation." Docket 87 at 20. Thus, Summers and Van Vooren's second motion for summary judgment is denied.

## CONCLUSION

In conclusion, Scheetz sets forth sufficient facts for this court to find that there is a question of fact for the jury to determine whether Summers and Van Vooren retaliated against Scheetz. Thus, it is

ORDERED that defendants' second motion for summary judgment (Docket 109) is DENIED.

Dated November 21, 2017.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE